**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DERRICK GIBSON,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **LIEUTENANT MR. THOMPSON, et al.** | : | |
| *Defendants.* | : | **NO. 24-CV-4836** |

**MEMORANDUM**

**KENNEY, J.**                                                                                   **July 8, 2026**

Defendants Lieutenant Thompson, Nurse Beth,[1] Nurse Cole, Captain Kevin Young, and

Sergeant Randall (collectively, "Defendants") move for partial summary judgment as to Plaintiff

Derrick Gibson's Eighth Amendment claims for deliberate indifference to medical care and

unconstitutional conditions of confinement, and First Amendment claim for retaliation. ECF No.

41 (the "Motion"). For the reasons set forth below, the Court will grant in part and deny in part

Defendants' Motion for Partial Summary Judgment.

  **I.    BACKGROUND**

Plaintiff Derrick Gibson, an inmate at State Correctional Institution Phoenix ("SCI

Phoenix"), filed a *pro se* Complaint against Defendants alleging claims for: (1) violation of his

rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq., and

---

[1]      Defendant Beth is named as "Nurse Ms. Beth" in the caption, though Defendants refer to
her in their Motion as "Defendant Stuebner" or "Defendant Stueber." *See* ECF No. 41 at 1, 6. For
the purposes of this Memorandum, the Court will refer to this Defendant by her stated party name
in the caption, Defendant Beth.
         Defendant Sergeant Randall's name is misspelled in the caption as Lt. Randle. *See* ECF
No. 22 at 1. For the purposes of this Memorandum, the Court will refer to this Defendant by his
correct title and spelling, Sergeant Randall.

1

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.; (2) deliberate indifference to medical care; (3) excessive force as to Defendants Randall and Thompson; (4) cruel and unusual conditions of confinement; and (5) retaliation. ECF No. 2 at 14–19 ("Compl.").

The facts underlying Plaintiff Derrick Gibson's claims arise from a series of events on September 26, 2022, at SCI Phoenix. ECF No. 42 ¶ 1. On the morning of September 26, 2022, Plaintiff suffered a severe mental health breakdown and made lacerations on his wrists with broken glass that was in his cell. *Id.* ¶¶ 5, 8–9, 11; ECF No. 42-1 at 9, 25. Plaintiff alleges that between 6:30 a.m. and 7:00 a.m., he notified Defendant Cole of his injuries and that he was suicidal, but she refused to give him medical treatment. ECF No. 42 ¶ 10; ECF No. 49 ¶ 5. Plaintiff also alleges that Defendant Cole notified Defendant Randall, who also refused to treat him for his injuries. ECF No. 42 ¶ 21.

At approximately 2:05 p.m., Plaintiff alleges that Defendant Randall "'ran' to his cell, moved the participation, slammed his hand in the slot, then put the participation back, and walked away." *Id.* ¶ 6. Plaintiff screamed in pain, and Randall came back to open the participation. *Id.* ¶ 7; ECF No. 42-2 at 1:50, 4:53. Plaintiff claims that at that time, Randall "saw his injuries but failed to report it." ECF No. 42 ¶¶ 3–4; ECF No. 49 ¶ 4.

Between 3:00 p.m. and 3:15 p.m., Plaintiff claims that Defendant Thompson "observed self inflicted wounds and injury by [Defendant Randall]." ECF No. 49 ¶ 1. Defendant Thompson alleges that he first observed what he described as "superficial lacerations on Plaintiff's arm" at 6:00 p.m., at which point Plaintiff was escorted to the East Trauma Triage for medical evaluation. ECF No. 42 ¶ 1.

Plaintiff arrived at the East Trauma Triage at approximately 6:29 p.m. ECF No. 42-1 at 11, 25. Defendant Beth treated Plaintiff's injuries with another nurse. ECF No. 42-2 at 14:30. After

2

the incident, Plaintiff was recorded continuously stating that Defendant Randall had slammed his hands in the slot at 2:05 p.m., expressing that he felt "hopeless," "helpless," and "suicidal," and repeatedly requesting to see a psychiatrist. *Id.* at 4:53, 26:29, 28:37. Another prison official, Captain White, and Defendant Thompson informed Plaintiff that "Dr. G" had been called, had Plaintiff assessed over the phone by some nurses, and ordered that he be placed in an in-camera cell with "sharps and sheets restrictions." *Id.* at 28:37; ECF No. 42-3 at 3:00, 11:35. Medical records indicate that Dr. Glushakow was notified of Plaintiff's injuries at 7:00 p.m. ECF No. 42-12 at 38.

Following his assessment at triage, Plaintiff was escorted back to his cell where a cleaning crew had been assigned to clean the cell. ECF No. 42-1 at 11, 21; ECF No. 42-3 at 18:01. Plaintiff alleges that, upon arriving back at his cell, he noticed that the broken pieces of glass were still on the floor, and that liquid feces were on his bed and bedframe, and he began shouting about both contaminants. ECF No. 47 at 3; ECF No. 49 ¶ 30; ECF No. 42-13 at 0:00–1:00.

During this final chain of events, Defendants gave Plaintiff eight warnings to display his hands in the wicket in order to uncuff his hands. ECF No. 42 ¶ 31–36; ECF No. 42-13 at 1:22–3:50. When Plaintiff repeatedly failed to comply, Defendant Thompson first deployed three seconds of OC spray and then showed Plaintiff his taser. ECF No. 42 ¶ 37–38; ECF No. 42-13 at 3:37, 5:20. Because Plaintiff still did not comply, the escorting officers pulled his cut arms through the wicket, during which he was recorded screaming in agony. ECF No. 47 at 3; ECF No. 42-13 at 6:03. Plaintiff alleges that Defendant Thompson deployed OC spray directly onto his open wounds. ECF No. 47 at 3.

The record contains evidence that Defendant Thompson failed to have Plaintiff medically evaluated after the OC spray was deployed, ECF No. 42-1 at 3, and escorting officers reported no

3

injuries during their immediate post-incident debrief, ECF No. 42-13 at 12:45. Video evidence shows that, after the guards exited, Plaintiff spent over five minutes repeatedly banging his head against his cell door, yelling that he was suicidal and screaming, "I need medical," which went unanswered. *Id.* at 7:08, 10:30.

On September 16, 2024, in connection with the above events, Plaintiff filed a complaint against Defendants Thompson, Beth, Cole, Young, and Randall, asserting claims for violation of his rights under the ADA and Section 504 of the Rehabilitation Act, deliberate indifference, excessive force, cruel and unusual conditions of confinement, and retaliation. *See* Compl. at 14–19. On April 3, 2026, Defendants moved for partial summary judgment as to Plaintiff's claims for deliberate indifference, excessive force (as to Defendant Thompson), unconstitutional conditions of confinement, and retaliation. ECF No. 41. On June 5 and 8, 2026, Plaintiff filed his opposition briefs to Defendants' Motion for Partial Summary Judgment. ECF Nos. 47–49. The Motion is now ripe for adjudication.

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only when a reasonable jury could return a verdict on the issue for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the Court must view any inferences drawn from the underlying facts "in the light most favorable to" the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). In a *pro se* litigant's proceeding, the court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran Affs.*, 165 F.3d 244, 248 (3d Cir. 1999).

III.    **DISCUSSION**

### A. A Genuine Issue of Material Fact Precludes Summary Judgment on Plaintiff's Claim for Deliberate Indifference to Medical Care Against Defendants Young, Randall, Thompson, Beth, and Cole

The record demonstrates a factual dispute regarding the timing of and access to Plaintiff's medical treatment. To survive summary judgment on a claim for deliberate indifference to medical care, the record must demonstrate a genuine dispute of material fact as to whether: (1) Plaintiff's medical need was objectively serious, or (2) Defendants were subjectively deliberately indifferent, which can include the intentional delay of treatment. *See Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976); *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987) (hereinafter "*MCCII*").

Defendants Young, Randall, Thompson, Beth, and Cole impliedly argue by way of citation that deliberate indifference requires an absolute denial or intentional refusal of care. ECF No. 41 at 7 (citing *MCCII*, 834 F.2d at 346). However, Defendants omit the very next sentence of the opinion they cite, which explicitly states that delaying necessary medical treatment for non-medical reasons constitutes deliberate indifference. *See MCCII*, 834 F.2d at 346 ("Short of absolute denial, 'if necessary medical treatment [i]s . . . delayed for non-medical reasons, a case of deliberate indifference has been made out.'" (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)) (alteration in original)); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 578, 581–83 (3d Cir. 2003) (finding summary judgment improper under the *Estelle* standard where insulin was delayed for 21 hours for an insulin-dependent diabetic). In delay-of-care claims, the inquiry is straightforward: "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was

5

motivated by non-medical factors." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2017).

Here, Defendants Thompson, Beth, Cole, and Young contend that Plaintiff received immediate medical treatment, relying on internal incident reports indicating that prison officials first became aware of Plaintiff's injuries at 6:00 p.m. and immediately escorted Plaintiff to Trauma Triage. ECF No. 41 at 7–8; ECF No. 42-1 at 9, 11, 27. Defendants argue that video surveillance confirms this timeline. *See* ECF Nos. 42-2, 42-3, 42-13.

However, in the video surveillance provided by Defendants, Plaintiff states numerous times that he had been requesting, and had been refused, medical assistance since the morning. Specifically, Plaintiff notes on camera that he was "telling them since seven o'clock [that] morning, eight o'clock at least." ECF No. 42-2 at 26:31. The video captures several similar statements by Plaintiff documenting a lack of immediate medical treatment. *See id.* at 14:35 ("I told him I was suicidal this morning."); *id.* at 16:50 ("I told them I was suicidal. Cut myself this morning. Nurse told them. Refused to give me medical treatment, refused to see the psych."); *id.* at 7:22 ("[I] still didn't get medical treatment after he slammed my hands in the slot."). Plaintiff emphasizes this dispute of material fact in his Opposition to Defendants' Statement of Undisputed Material Facts, stating that he showed his self-inflicted injuries to Defendant Thompson around 3:00 p.m. ECF No. 49 ¶ 1. Meanwhile, Defendant Thompson asserts that he first observed lacerations on Plaintiff's arm at 6:00 p.m. ECF No. 42 ¶ 1. Plaintiff was not transported to the medical unit until after 6:00 p.m. *Id.* ¶ 2; ECF No. 42-1 at 11.

Viewing the evidence in the record in the light most favorable to the non-moving party, a reasonable jury could find that Defendants Thompson, Beth, Cole, and Young had knowledge of an obvious or stated medical and psychological need at least several hours before 6:00 p.m. and

6

that their failure to act constituted an intentional delay motivated by non-medical factors. Because Plaintiff's statements on camera present a genuine issue of material fact as to both the timeline of events and whether each individual Defendant knew about Plaintiff's medical needs, the Court is precluded from granting summary judgment on Plaintiff's deliberate indifference claim against Defendants Young, Randall, Thompson, Beth, and Cole.

However, Defendants assert that Plaintiff failed to exhaust his deliberate indifference claim against Defendants Beth, Cole, and Thompson by neglecting to mention them in Grievance No. 999646 detailing his deliberate indifference claim. ECF No. 41 at 22. In order to exhaust his administrative remedies, Plaintiff must file an initial grievance, appeal the grievance if denied, and then further appeal for a final review. *See Booth v. Churner*, 206 F.3d 289, 299–300 (3d Cir. 2000); *Spearman v. Morris*, 643 F. App'x 82, 85 (3d Cir. 2016); *infra* Section III.D. Each defendant must be listed in the grievance for proper notice. *Spruill v. Gillis*, 372 F.3d 218, 234 (3d Cir. 2004). Each claim and factual circumstance must also be listed in the grievance. *Boyd v. United States*, 396 F. App'x. 793, 796 (3d Cir. 2010).

The Court notes that in Grievance No. 999646, Plaintiff mentioned the "pill line nurse," who is identified as Defendant Cole in the record. ECF No. 42-14; ECF No. 49 ¶ 5. Pursuant to the Inmate Grievance System, Plaintiff was required to file a grievance specifying each individual involved within fifteen working days of the underlying event. *See* Pa. Dep't of Corr., *Inmate Grievance System*, DC-ADM 804 § 1(A)(8); *id.* § 1(A)(11)(a)–(b) (the grievance "shall include the date, approximate time, and location of the event(s) that gave rise to the grievance" and "shall identify individuals directly involved in the event(s)"); *see also Spruill*, 372 F.3d at 233 (explaining that the verb "shall" denotes a mandatory requirement of a prison's grievance system).

However, even though Defendant Cole was not specifically named in Grievance No. 999646, the description "pill line nurse" was enough to put her on notice. The Third Circuit has recognized that a procedural defect under DC-ADM 804, such as failing to name a specific individual, can be excused if the grievance provides sufficient notice to allow the prison to identify the person involved and "acknowledg[e] that they were fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234. Accordingly, Plaintiff's failure to identify Defendant Cole by name does not automatically require the Court to grant Defendant Cole summary judgment on Plaintiff's deliberate indifference claim. Because the Court finds that Plaintiff's grievance was sufficient to allow the prison to identify Defendant Cole as the individual involved and therefore put Cole on notice of Plaintiff's complaints against her, the Court will deny summary judgment on exhaustion grounds with respect to Defendant Cole.

By contrast, Defendant Beth was not mentioned in any capacity in any of the grievances in the record. Defendant Thompson was not mentioned in any capacity in Grievance No. 999646, ECF No. 42-14, and was only mentioned in Grievance No. 1001641 in relation to his deployment of OC spray, ECF No. 48 at 2. As such, Plaintiff has failed to exhaust his administrative remedies with respect to Defendants Beth and Thompson for his deliberate indifference claim. Therefore, the Court will grant summary judgment for Defendants Beth and Thompson as to Plaintiff's deliberate indifference claim but will deny summary judgment as to all other Defendants on this claim.

### B. Defendant Thompson Is Not Entitled to Summary Judgment on Plaintiff's Excessive Force Claim Because He Failed to Decontaminate Either Plaintiff or Plaintiff's Cell After the OC Spray Deployment

In support of his argument for granting summary judgment on Plaintiff's excessive force claim against him, Defendant Thompson contends that he did not use excessive force when he

utilized OC spray because Plaintiff refused to show his hands through the wicket after at least eight commands to do so. ECF No. 41 at 8. The video exhibits filed with Defendants' Motion support this contention. ECF No. 42-13 at 1:03–6:25.

Although the initial use of OC spray did not constitute excessive force because it was used to gain compliance, Defendant Thompson has nonetheless failed to demonstrate that his actions in the aftermath of the deployment were constitutional. A failure to decontaminate an inmate or provide medical attention after a deployment of OC spray can sustain an Eighth Amendment excessive force claim if it causes unreasonable, prolonged harm. *See Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996); *Martin v. Wetzel*, No. 1:18-cv-00215, 2021 WL 2926005, at \*9 (W.D. Pa. July 12, 2021).

The use of OC spray is generally constitutional when "applied in a good faith effort to maintain or restore discipline." *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (quoting *Johnson* v. *Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). The Third Circuit has recognized that OC spray can be used in good faith to compel inmate compliance but has also considered whether prison officials provided adequate medical care following its deployment. *See Martin v. Sec'y Pa. Dep't of Corr.*, No. 21-2406, 2024 WL 1952864, at \*1 (3d Cir. May 3, 2024) (noting that both plaintiff and his cell were decontaminated following the good faith deployment of OC spray when removing the noncompliant plaintiff from his cell); *Gibson v. Flemming*, 837 F. App'x 860, 862 & n.3 (3d Cir. 2020) (explaining that plaintiff received medical attention within thirty minutes of OC spray deployment after finding that the initial deployment was "required to prevent [the inmate] from hurting himself"); *see also Jones v. Wetzel*, No. 4:13-cv-1400, 2017 WL 4284416, at \*8–9 (M.D. Pa. Sept. 27, 2017) (stating that a medical official was present when OC spray was deployed and treated plaintiff afterward). However, the Third Circuit has not yet addressed the precise scenario

9

present here: whether failure to provide decontamination following an initially reasonable, good faith deployment of OC spray can independently sustain an excessive force claim.

Even so, the Third Circuit has found that an officer cannot use force "against an inmate who has been subdued." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). Moreover, the courts of appeals of other Circuits have recognized that the failure to decontaminate an inmate who has been subdued by the good faith deployment of OC spray can rise to the level of excessive force. *See, e.g., Danley v. Allen*, 540 F.3d 1298, 1308 (11th Cir. 2008), *overruled in part on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Williams*, 77 F.3d at 765. For example, the Eleventh Circuit has observed that, because pepper spray causes burning, breathing difficulties, and temporary blindness, "[t]he use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell" for twenty minutes after deployment of OC spray could constitute excessive force. *Danley*, 540 F.3d at 1309–10. Similarly, the Fourth Circuit has held that keeping an inmate "helpless and in immense pain for eight hours" in his cell following the deployment of OC spray "clearly supports an inference that the guards were acting to punish, rather than to quell the disturbance." *Williams*, 77 F.3d at 765.

District courts within this Circuit have acknowledged out-of-circuit authority. *See Bomar v. Wetzel*, No. 17-cv-1035, 2020 WL 907641, at *5 (W.D. Pa. Feb. 3, 2020) (acknowledging that "failure to decontaminate . . . prisoners exposed to pepper spray can support a claim for a violation of the Eighth Amendment where the 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain'" (quoting *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002)) (internal quotations omitted)); *see also Gibson v. Mason*, No. 3:22-cv-1538, 2025 WL 1932743, at *15 (M.D. Pa. July 14, 2025) (granting summary judgment because the inmate was promptly transported for assessment and decontamination six minutes after

10

OC spray deployment). In *Martin v. Wetzel*, the court granted summary judgment on an excessive force claim in large part because the record established that the inmate was immediately removed from his cell, permitted to decontaminate, and evaluated by medical staff following the deployment of OC spray. 2021 WL 2926005, at *9, 13.

The ultimate inquiry for Eighth Amendment excessive force claims is whether the force was applied maliciously and sadistically for the purpose of causing harm. *Whitley*, 475 U.S. at 320–21. To that end, courts utilize the five-factor framework established in *Whitley*, which provides that courts must balance "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley*, 475 U.S. at 321).

Here, the record demonstrates that Plaintiff initially refused to show his hands through the wicket to remove his handcuffs even after multiple commands from prison officials, ECF No. 42 ¶¶ 31–36, and only complied after Defendant Thompson deployed the OC spray, *id.* ¶¶ 37–39. These facts are supported by video evidence. *See* ECF No. 42-13 at 1:03–6:25. Thus, the first *Whitley* factor weighs in favor of finding the initial deployment of OC spray reasonable.

However, the record also demonstrates that Defendant Thompson subsequently failed to have Plaintiff medically evaluated after the OC spray was deployed. ECF No. 42-1 at 3; *see* ECF No. 47 at 3–4. Plaintiff contends that his "open wounds [were] sprayed with the OC [spray] causing unnecessary pain and suffering and him to scream for help." ECF No. 47 at 3. Therefore, the

11

remaining factors, when applied to Defendant Thompson's post-deployment conduct, preclude summary judgment.

Regarding the second, third, and fourth factors, Defendant alleges that Plaintiff only received minor exposure to OC spray. ECF No. 41 at 12. Even then, this argument discounts the fact that Plaintiff had open wounds, which could have been affected by even minor exposure. Any threat of noncompliance ceased once Plaintiff placed his hands through the wicket for removal of his handcuffs. *See* ECF No. 42 ¶ 39. Because Plaintiff then complied, keeping him confined in a possible state of distress and at risk of further injury to his open wounds appears to have been a punitive response and disproportionate to any penological need.

Finally, as to the fifth factor (efforts to temper the severity of force), Defendant Thompson argues that he "gave multiple orders" for Plaintiff to comply, "limited his force to OC spray for several seconds," and showed a taser in an effort to temper the severity of a more forceful response. ECF No. 41 at 12. Thompson's argument focuses solely on the reasonableness of his use of OC spray. It does not address what steps he took to mitigate Plaintiff's pain following deployment. Further, it appears that Defendants did nothing when Plaintiff banged his head on the cell door for over five minutes and requested medical assistance multiple times following the OC spray deployment. ECF No. 42-13 at 7:08–12:30. The video ends with a debrief where Thompson and both escorting officers state that there are no further injuries to report. *Id.* at 12:45.

Because a reasonable jury could find that the total failure to decontaminate Plaintiff after a reasonable use of OC spray caused Plaintiff unreasonable and unnecessary pain, Defendant Thompson is not entitled to summary judgment on Plaintiff's excessive force claim.

**C.  Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiff's Conditions of Confinement Claim Against Defendants Young, Randall, Thompson, Beth, and Cole**

Defendants Young, Randall, Thompson, Beth, and Cole move for summary judgment on Plaintiff's conditions of confinement claim, arguing that the record contains no evidence indicating that housing Plaintiff in a single cell posed a dangerous risk of self-harm, or that Defendants were aware of any such risk. ECF No. 41 at 13. This argument, however, mischaracterizes Plaintiff's claim. Plaintiff does not contend that assigning him to single-cell housing violated his constitutional rights but rather asserts that Defendants left him in a cell containing broken glass, failed to remove the glass after Plaintiff used the glass to harm himself, and returned him to that same hazardous cell after he stated that he was suicidal. Compl. ¶¶ 2, 4, 14; ECF No. 47 at 3.

Additionally, Plaintiff alleged that Defendant Thompson was deliberately indifferent to the presence of feces in Plaintiff's cell, which exposed Plaintiff to serious harm. Compl. ¶ 14. Defendant Thompson moves for summary judgment on this claim, raising two arguments: (1) that the video evidence disproves the presence of fecal matter; and (2) that, even if the allegations are true, the exposure does not rise to the level of a constitutional violation. ECF No. 41 at 16.

An inmate can prevail on an inhumane conditions of confinement claim under the Eighth Amendment if (1) objectively, the prison officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) subjectively, prison officials "[drew] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Ultimately, for deprivation to rise to the level of a constitutional violation, a person must be deprived of "the minimal civilized measure of life's necessities," *id.* at 834 (citation omitted), which can include a future health risk "that today's society chooses [not] to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

To survive summary judgment, a plaintiff must demonstrate sufficient evidence of "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3)

13

causation." *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997). Deliberate indifference, as applied to a conditions of confinement claim, includes "recklessness." *Farmer*, 511 U.S. at 836, 838, 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *see also Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000) (en banc).

A plaintiff may establish a risk of serious harm by demonstrating an obvious, pervasive risk of future injury. *See Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 256–59 (3d Cir. 2010). In *Betts*, the Third Circuit discussed the Supreme Court's holding in *Helling v. McKinney*, 509 U.S. 25 (1993), recognizing that the Eighth Amendment protects inmates from future health and safety risks where prison officials deliberately ignore conditions highly likely to cause future harm, such as, in *Helling*, second-hand smoke. *Betts*, 621 F.3d at 256–57. To establish a future risk under *Helling*, an inmate must demonstrate that the potential injury is sufficiently serious, that there is a high likelihood the condition will cause the injury, and that the risk is one "that today's society chooses [not] to tolerate." *Helling*, 509 U.S. at 36.

Where the impending risk of future harm is self-inflicted injury or suicide, courts have found the risk to be both obvious and intolerable under the *Helling* standard. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021) (holding that the risk of suicide is a "grave" risk of harm that is "not one that today's society chooses to tolerate" (quoting *Helling*, 509 U.S. at 36)); *cf. Coit v. Garman*, 812 F. App'x 83, 87–88 (3d Cir. 2020) (affirming summary judgment for prison officials where the suicidal inmate's conditions of confinement claim was premised on a ban against him having blankets and sheets and was "vague and conclusory"). In *Coit*, prison

14

officials properly performed cell searches to actively remove hazardous materials after the inmate mutilated himself with a piece of glass from a broken light. 812 F. App'x at 85.

A prison official's subjective knowledge of a substantial risk of harm can be established by showing circumstantial evidence of an obvious risk. *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 131–33 (3d Cir. 2001). In *Hamilton v. Leavy*, the Third Circuit concluded that summary judgment was improper because the injured plaintiff, an inmate who was a government informant, presented sufficient circumstantial evidence that prison officials had subjective knowledge of a substantial risk to his safety yet still assigned him to the general population despite explicit recommendations that he be placed in protective custody. 117 F.3d at 747–48. A district court in this Circuit recently emphasized that prison officials cannot escape liability at the summary judgment stage by minimizing an inmate's risk of psychological harm. *See Thomas v. Little*, No. 22-cv-2246, 2026 WL 751742, at *6–7 (E.D. Pa. Mar. 17, 2026). In *Thomas*, the court denied summary judgment to prison officials who failed to protect a self-harming inmate, rejecting their argument that the inmate's actions were "manipulative or motivated by 'secondary gain.'" *Id.* at *6 (record citations omitted). The court held that the defendants' assertion that plaintiff was manipulative presented a "credibility-based factual issue for a factfinder" rather than an issue that could be resolved by the court on a summary judgment motion. *Id.* at *7.

Here, contrary to Defendants' arguments, Plaintiff does not contend that he should not have been placed in a single cell due to his suicidal ideations. *See* ECF No. 41 at 16. Rather, Plaintiff contends that, on the date of the incident, he voiced his risk of self-harm, which was exacerbated by glass in the cell, with which he had already injured himself, and instead of removing him from the cell or removing the glass, Defendants were deliberately indifferent to his calls for help and returned him to the same dangerous conditions. ECF No. 47 at 3. Video evidence in the record

15

shows that Plaintiff was waiting outside his cell for over ten minutes while his cell was being cleaned. ECF No. 42-3 at 18:01–32:25. The escorting officer can be heard telling Plaintiff that the psychiatrist instructed that he be given "no sharps, no sheets." *Id.* at 32:27. Plaintiff states in the video multiple times that he had informed officers that he was suicidal and had requested medical help as early as 7:00 a.m. *Id.* at 26:30.

Because the record contains evidence that Plaintiff injured himself and repeatedly notified prison staff of his suicidal ideations, a reasonable jury could infer that Defendants had actual, obvious knowledge of a substantial risk to Plaintiff's safety. In their Motion, Defendants fail to address the presence of the broken glass or demonstrate the absence of a factual dispute regarding their knowledge of the glass. *See generally* ECF No. 41. While video footage in the record captures Plaintiff's cell door, it does not show the inside of the cell. *See* ECF No. 42-13. Therefore, whether Plaintiff's cell contained broken glass prior to the incident and whether any cleaning efforts effectively removed all the glass following Plaintiff's medical visit remain unresolved factual disputes that cannot be determined on a summary judgment motion. Accordingly, Defendants have failed to meet their burden under Rule 56, and summary judgment on Plaintiff's conditions of confinement claim as to Defendants Young, Randall, Thompson, Beth, and Cole is denied.

Finally, as to Plaintiff's claim regarding fecal matter in his cell, the Court must analyze the severity, duration, and surrounding circumstances of the fecal exposure to determine whether a conditions of confinement claim can survive summary judgment. *See Martin v. Gearhart*, 712 F. App'x 179, 187 (3d Cir. 2017) (affirming the district court's grant of summary judgment on a conditions of confinement claim because the fecal exposure was "of limited severity and duration"); *Banks v. Mozingo*, 423 F. App'x 123, 127–28 (3d Cir. 2011) (affirming the district court's grant of summary judgment on a conditions of confinement claim because the feces that

was on the wall was put there by the plaintiff himself); *McKeithan v. Beard*, 322 F. App'x 194, 202 (3d Cir. 2009) (finding that the presence of feces in air vents was sufficient to survive summary judgment).

Here, video evidence submitted by Defendants does not affirmatively disprove the presence of fecal matter in Plaintiff's cell. *See* ECF No. 42-13. As noted, the video footage captures the small cell opening but does not show the cell itself so as to conclusively establish the sanitary condition of the cell. Accordingly, there remains an issue of material fact as to the presence and severity of fecal matter in Plaintiff's cell, and as such, summary judgment on Plaintiff's conditions of confinement claim as to Defendant Thompson is denied.

### D. Plaintiff Failed to Exhaust His Retaliation Claim

Defendants assert the affirmative defense of exhaustion to Plaintiff's retaliation claim, arguing that Plaintiff did not file a grievance related to the facts in his retaliation claim. ECF No. 41 at 19–22; ECF No. 42 ¶ 44. Pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), a prisoner must properly exhaust all administrative remedies that are "available"—that is, remedies that are "capable of use to obtain some relief for the action complained of." *Webb v. Dep't of Just.*, 117 F.4th 560, 567 (3d Cir. 2024) (citation omitted); *see also Perttu v. Richards*, 605 U.S. 460, 464–65 (2025). Proper exhaustion gives prisons an opportunity to resolve complaints internally, screen out claims that lack merit, and develop an administrative record to assist in any later litigation. *See Booth v. Churner*, 532 U.S. 731, 737 (2001). In order to properly exhaust, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *see Jones v. Bock*, 549 U.S. 199, 218 (2007) (explaining the Supreme Court's holding in *Woodford*). The applicable procedural rules a prisoner

17

must follow to properly exhaust "are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. And so, the Court turns to the grievance process available to inmates at SCI Phoenix to determine whether Plaintiff properly exhausted his administrative remedies for his retaliation claim.

The formal procedure through which inmates in the custody of the Pennsylvania Department of Corrections may seek resolution of problems arising during their term of imprisonment is known as the Inmate Grievance System. Pa. Dep't of Corr., *Inmate Grievance System*, DC-ADM 804 (effective May 1, 2015). The Inmate Grievance System requires an inmate to file a grievance within fifteen working days of the underlying event, using the designated grievance form. *Id.* §§ 1(A)(5), 1(A)(8). It consists of an initial review stage and two rounds of appeals. *Id.* §§ 1(C), 2(A), 2(B). The initial grievance "must include a statement of the facts," which "shall include the date, approximate time, and location of the event(s) that gave rise to the grievance." *Id.* § 1(A)(11). The initial grievance also "shall identify individuals directly involved in the event(s)." *Id.* The grievance policy provides that "[a]ny grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim." *Id.* § 1(A)(14).

Here, the record contains three grievances, or appeals thereof, related to the events of September 26, 2022: (1) Grievance No. 999646, filed on September 26, 2022, claiming that Defendant Randall slammed Plaintiff's hand in the secure wicket aperture around 2:05 p.m. after Plaintiff had notified Defendant Randall, Defendant Young, the "pill line nurse" (Defendant Beth), and others that he "felt helpless, hopeless and suicidal," ECF No. 42-14; (2) Grievance No. 1001641, to which a denial of appeal is dated June 26, 2023, claiming that Defendant Thompson deployed OC spray on Plaintiff's open wounds, stomach, chest, and face without notifying the

medical department to decontaminate and treat Plaintiff, ECF No. 48 at 2; and (3) Grievance No. 1002029, to which a denial of appeal is dated May 10, 2023, claiming abuse from unstated parties but noting that the grievance is the same as Grievance No. 1001641 regarding Defendant Thompson, *id.* at 3. The events surrounding Plaintiff's retaliation claim are not mentioned in any of the grievances in the record.

As such, Plaintiff has failed to exhaust his administrative remedies with respect to his retaliation claim. Therefore, the Court will grant summary judgment to Defendants as to Plaintiff's retaliation claim.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Defendants' Motion for Partial Summary Judgment (ECF No. 41). The Court will grant summary judgment as to Plaintiff's retaliation claim against all Defendants and Plaintiff's deliberate indifference claim against Defendants Beth and Thompson, but will deny summary judgment as to Plaintiff's excessive force claim, conditions of confinement claim, and deliberate indifference claim against Defendants Young, Randall, and Cole.

An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

**CHAD F. KENNEY, JUDGE**